MORAN v. YOUNG.

Opinion delivered June 3, 1929.

M. F. Elms, for appellant.

W. A. Leach, for appellee.

HUMPHREYS, J.   Charles Young instituted suit against A. E. Moran, in the chancery court of Arkansas County, Northern District, to rescind an executory contract for the purchase of the west half of section 15, township 3 south, range 5 west, in said county, and to recover escrow deposits made by him pursuant thereto, upon the alleged ground, amongst others, that appellant had breached the contract by failing to procure a loan for him on said land from a State Land Bank for the term of thirty-three years, under its amortization plan, to be secured by a mortgage thereon, which would contain a provision allowing appellee to retire the full amount or any part of the loan on any interest-paying date after the first year up to the fifth year by paying a bonus of one-half of one per cent. plus the amount of interest due at the time.

A. E. Moran filed an answer and cross-complaint, admitting that the contract for the sale and purchase of the land deposited in escrow included a provision requiring him to procure said loan embracing the alleged repayment clause, but alleging full and complete compliance therewith, and praying for a specific performance of the contract.

The cause was submitted upon the pleadings and testimony, which resulted in a decree dismissing Charles Young's complaint for the want of equity, and for a conditional specific performance of the contract in favor of appellant on his cross-complaint, from which each party has appealed in so far as the decree is adverse to him.

The agreement was entered into on the 2d day of April, 1927, at which time the New England Securities Company of Kansas City, Missouri, was the owner and holder of a mortgage against the entire section of land for $20,000, one-half of which was to be paid out of money Moran was to borrow for Young from said State Land Bank, in order to obtain a release of the west half of said section from the mortgage owned by the New England Securities Company. The escrow contract for the sale and purchase of the west half of said section provided that, in the event Moran could not borrow enough money from said State Land Bank to pay as much as $10,000 on the mortgage of the New England Securities Company, he would apply such amounts as he was able to borrow thereon, and would pay the balance himself and take a note or notes and mortgage from Young on the west half of said section to secure the amount paid by him. The total consideration which Young was to pay Moran for the west half of said section was $35,000, $10,000 of which amount was to be paid by Young's assumption of one half of the mortgage owned by the New England Securities Company, which he was to pay out of the money to be borrowed from the State Land Bank upon a new mortgage executed by him to it. This undertaking on the part of Moran was incorporated in the escrow contract in the following language:

"Vendor (A. E. Moran) agrees to secure for purchaser (Charles Young) a State Land Bank loan on the land herein described and hereby sold, said loan to be for the customary term of thirty-three years on the amortization plan, and to be for as great an amount as can be procured through the State Land Bank or Joint Stock Land Bank. It is understood that the interest rate is not to exceed six per cent., and that one per cent. is to be paid on the principal of the loan each year, and that said mortgage shall contain a clause therein whereby purchaser herein shall be granted the privilege of re-

tiring the full amount or any part of the loan on any interest-paying date after the fifth year, or shall have the privilege of retiring the full amount or any part of the loan on any interest-paying date after the first year up to the fifth year by paying a bonus of one-half of one per cent. plus amount of interest due at that time. It is understood that, in the event the loan is made by the State Land Bank or Joint Stock Land Bank, the proceeds of such loan are to be applied on the indebtedness of $10,000, which purchaser herein assumes, and agrees to pay to the New England Securities Company as hereinbefore specified. In the event that the proceeds of such loan shall not be sufficient to retire the full amount of the $10,000 indebtedness due the New England Securities Company (and interest on same, if any due at that time), then in that event vendor agrees to pay to New England Securities Company the amount still due them over and above the amount applied on the indebtedness due by purchaser, and purchaser agrees to execute his note to vendor for the amount so paid by vendor, said note to be due and payable on or before the first day of January, 1931, and to be secured by the same mortgage securing the payment of the three notes of $2,000 each due in 1928, 1929, and 1930, respectively, and bear the same rate of interest.''

The deeds, check, stock, etc., provided for in the escrow contract were deposited with the People's National Bank of Stuttgart, to await the inspection of the Mississippi land, the investigation of the stock in the Armour Packing Company, the mortgage on the Colorado land, and the procurement of a loan from a State Land Bank by Moran, and the examination and approval of an abstract of title to the west half of said section of land by Young.

On May 2, 1927, A. E. Moran applied to the Southwest Joint Stock Land Bank, located at Little Rock, Arkansas, for a loan of $10,000 on the west half of said section, in accordance with his undertaking in the escrow

contract. On May 27 following he was notified that the executive committee of the bank had declined to grant the loan. The declination was based upon the fact that the appraiser's report indicated that the proposed purchaser of the farm was perhaps a trader or speculator, and nonresident of the State, and not a practical rice · farmer. The letter to Moran conveying this information intimated that the committee would be inclined to look on the loan with favor if the title should remain in him and the farm should have his personal supervision. Subsequently Moran must have informed Young the loan had been declined by the Southwest Joint Stock Land Bank, for, in a letter written by Young to Moran on July 20, Young made the following reference to the matter:

"In regard to that loan, I don't know as it makes any difference to me if they don't want to make it. Don't know as I care if I don't go in debt any more, and if you would just as soon drop the trade, it will be all right with me. You could maybe sell it now for a little more money."

At a later date, it does not appear just when, Moran had an interview with some of the officials of the Southwest Joint Stock Land Bank concerning the loan, and obtained from them an application for the loan to be signed by Charles Young. This application contained the following clause with reference to the terms and repayment of the loan:

"For a loan of $10,000 for a term of 33 years, with interest at the rate of 6 per cent. per annum, the principal and interest to be payable semi-annually on the amortization plan, according to the amortization table prescribed by the Federal Farm Loan Board, with the privilege of paying additional amounts, or the whole amount of the debt, on any installment date after five years from the date of the loan."

This application was sent by Moran to Young, but he declined to sign it because it did not contain a repayment clause to the effect that he might retire the full

amount or any part of the loan on any interest-paying date after the first year up to the fifth year by paying a bonus of one-half of one per cent. plus amount of interest due at that time. He requested Moran to insert such a clause, but Moran informed him that he had no authority to do so. During the latter part of June, or early in July, Moran requested Young to release the deed to the Mississippi land from escrow, in order that he might sell it to a probable purchaser. On the 8th day of July following, Young declined the request by letter, as follows:

"Mr. Moran:

"Sir: I feel you are asking a right smart of me, when that deed is being held in escrow there. I am only filling my part of our contract. As I see it, that shouldn't need to hold you up long, if at all. They are certainly taking their time about their loan, but I prefer to wait about this until everything is ready to be completed.

"Respectfully,
"Chas. Young."

On August 27 following, Young notified Moran that he had examined the abstract, and found that it showed a mortgage for $2,832 unreleased. In the letter he said that he would go down and close the deal at any time they might notify him. Just what occurred in the interim does not appear, but on September 5 thereafter Young wrote the following letter to Moran:

"Mr. Moran:

"Sir: I have been bothered and worried all I am going to. My lawyer tells me that I am perfectly justified in calling that trade off, and you can, return that stuff I have there in the bank, in escrow, and the abstracts that you hold, and I will return yours to you.

"As ever,
"Chas. Young."

Immediately after receiving the letter, Moran wired Young to come to Stuttgart at his expense. In reply

Young informed him that he would start down the first part of the following week. He went down, and an attempt was made to adjust the matter, but nothing was accomplished in the way of a settlement. Young testified that Moran tried to get him to assume one-half of the mortgage held by the New England Securities Company without exacting that he get a loan from a State Land Bank to take it up. Moran testified that he informed Young that the Southwest Joint Stock Land Bank at Little Rock had agreed to make a loan for $8,000 and to incorporate in the mortgage the repayment clause which he had been insisting upon. Young then returned to his home, and on September 21 thereafter wrote the following letter to the People's National Bank at Stuttgart:

"To the People's National Bank,
   Stuttgart, Arkansas:

   "You are advised that A. E. Moran of Stuttgart, Arkansas, has failed to comply with his contract with Chas. Young, a copy of which contract you now have, together with other papers, bonds, deeds, cash, note and mortgage, delivered to you to be held in escrow and to be delivered as per instructions attached thereto.

   "Now therefore, in view of the inability upon the part of the said A. E. Moran to carry out his agreement, I am compelled to declare the contract at an end; and, in consequence of his failure as aforesaid, I hereby demand that you return to me the aforesaid $5,000 received by you in form of check, the mortgage and note, the stock certificate and the deed to the Mississippi land, and all the papers mentioned and described and delivered in escrow.

                              "Respectfully,
                                    "Chas. Young."

   On October 29 thereafter he wrote a personal letter to Mr. McCoy, the president of the bank, to the same effect, to which he received a reply refusing to return the escrow papers to him.

Moran testified that he wanted to indemnify Young against any loss he might sustain if the Southwest Joint Stock Land Bank refused to incorporate the repayment clause in its mortgage, but that Young refused to close the deal on any other basis than a discount on the original contract price.

Both Moran and McCoy testified that the officials with whom they had an interview with reference to making the loan agreed to incorporate in the mortgage the repayment clause contained in the escrow contract between Moran and Young.

Grady Miller, vice-president and secretary and member of the board of directors of the Southwest Joint Stock Land Bank, testified that, some time after the application for the $10,000 loan was disapproved, Moran and McCoy came to the bank and asked that the application be reconsidered, and that, after further discussion, it was agreed that an $8,000 loan would be made; that an application was made for Young to sign, but that it was never returned to the bank; that he had no recollection of any agreement to the effect that the mortgage, when executed to secure the $8,000 loan, should contain a repayment clause in accordance with the provisions of the escrow contract; that the basis upon which payments might be made within the first five-year period was upon payment of a bonus of one-half of one per cent. plus the amount of interest due at the time; that he had no recollection of any special arrangement to allow Young to repay within the first five-year period on the basis of paying a bonus of one-half of one per cent. plus the amount of interest due at that time.

Moran's only objection to the decree rendered by the trial court is that it imposed, as a condition for specific performance of the contract, that he should procure from the source and upon the terms and conditions set forth in the escrow contract, a loan upon said land for Young. Young contended, on the other hand, that the trial court erred in rendering a conditional decree for

the specific performance of the executory contract, and, instead of rendering such a decree, he should have rendered a decree rescinding the contract and ordering a return to him of all escrow deposits which he made. Moran bases his contention:

(1). Upon the theory that the undertaking to obtain a loan was not a part of the consideration of the contract, but was a collateral undertaking, for the breach of which Young might recover damages but could not rescind the contract. The cases cited by him in support of the contention were dealing with contracts fully executed. The rule invoked has no application to executory contracts. (2). Upon the theory that the agreement to obtain the loan was a promise to do something in the future, and would furnish no grounds for canceling the contract. The cases cited by him in support of this contention related to future promises made for the purpose of inducing parties to enter into the contract, and not to promises forming a part of the contract. The promise in the instant case to obtain a loan was a part of the contract itself, and a failure to redeem the promise was just as good ground for rescinding the contract as a failure to furnish an abstract or to perform a part of the contract. (3). Upon the theory that he fully performed the agreement to obtain the loan, and that the accomplishment thereof was thwarted by Young's failure and refusal to sign the application. The application he secured from the Southwest Joint Stock Land Bank did not contain the provision with reference to the repayment of the loan within the five-year period which was a part and parcel of the written escrow contract. Young therefore had a perfect right to refuse to sign it. On the contrary, Moran told him that he did not have authority to insert such a provision in the application. Moran should have presented an application conforming in substance to the repayment clause in the written escrow contract.

Again, Grady Miller, who seemed to be in control of this particular loan, stated that he had no recollection of the bank ever agreeing to make same upon the basis that Young might repay the full amount or any part of the loan after the first up to the fifth year by paying a bonus of one-half of one per cent. plus amount of interest due at that time. He said that it was not the custom to do so, and that he could not recall that any exception had been made in this particular application.

Moran also argues that no time was specified for him to obtain a loan, and for that reason the contract should not be rescinded. Where no time was fixed, he had a reasonable time in which to perform the conditions and the requirements contained in the written escrow contract. This he did not do. The escrow contract was entered into on April 2, 1927, and at the time of the institution of the suit he had not obtained even a promise of a loan on an application embracing the repayment provision contained in the escrow contract relative to retiring the loan during the first five-year period. More than a reasonable time had expired between the date of the contract and the date on which Young demanded a rescission thereof.

Under the evidence Young was entitled to a rescission of the contract, and the court erred in dismissing his complaint praying for a rescission and cancellation thereof and the return of the instruments deposited in escrow.

On account of the error indicated the decree is reversed, and the cause is remanded, with directions to the court to render a decree in accordance with this opinion.